DeMora, Defendant, Appellee. Arguing on behalf of the Defendant's Appellant, Mr. Brian W. Coffman. Arguing on behalf of the Defendant's Appellee, Mr. John A. Gordon. Mr. Coffman, you may proceed. Good morning, Your Honor. Good morning. May I please have the Court's counsel? As the Court has read from our briefs that we have filed in this case, there are some serious policy considerations at issue as to how the Court failed to look at the Wagner-Rhodes rules that I will call them that merit and also the formula in determining how to award attorney fees in a contract. Now, just to summarize, your position was you should have been entitled to the entire amount, correct? Correct. Okay, and the Court proceeded on a quantum Meriweth theory because you were discharged. We believe that the Court actually did not weigh the seven factors that have been spelled out in the Wagner-Rhodes case. We believe that they only considered one or two of the factors, and we believe that actually when reading closely the Wagner-Rhodes cases, you'll see that the last factor, which is the benefit to the client, is the one that should have the most weight on the formula. If I wanted to clarify, it was a quantum Meriweth theory? It was. However, we don't believe that the Court actually filed the first step, which would be awarding the entire contract fee first to us. And then the quantum Meriweth should have been weighed on what the successor counsel did just as it's laid out in the Rhodes and Wagner forms. And in doing so, the judge in this case, the lower court, considered evidence, considered testimony, that had no bearing on the outcome of the final matter as far as what benefits the client in this case received. If your honors look at the record that was from the lower court, you'll see that the policy offer that was obtained, was obtained by our law firm before there was a discharge. It basically, State Farm said, you know, re-render, buy an intoxicated driver, charge with DUI, lucky it wasn't a reckless homicide, here's the maximum. What effort was that? What effort was involved in procuring that? So if your honors, if you look at what happened in this case, when we were hired very shortly after this crash occurred, at the time Mr. DeMora, our client, needed necessary medical treatment. He did get that treatment. As he was going through his process of treatment, I communicated and my staff communicated with his medical providers. I met with the surgeon twice. In addition, we also hired a private investigator to seek, just as your honor talks about that this is a pretty simple case, to consider if there is any other coverage, either through any type of dram shop action. When did you do that? I'm sorry? When was that done? That was done within the first six months of us retaining this case. In addition, we determined if this gentleman has any other assets. We did a background check. We hired a private investigator to go look at him to see what type of job he had. He was a simple carpenter. He had a pretty small house. From all accounts, he was not able or could be incapable of paying any type of excess work. All right. So I'm going to say you're saying you did some things beyond simply sending a letter and getting this offer. Yes. Is it your position that you should have gotten an entire fee? It is our position. It actually is based on the case law as well. If you look at the California case, the Fracasi case, which Wagner and Rhodes provide on, they talk about that even some work or much work that they use, the entire contract fee shouldn't be awarded. And then if there's a question as to a successor firm coming in, that successor firm should be the one that the quantum merit analysis should be applied to. What happened to the injured man's dram shop remedy? So there was no dram shop remedy. And why was that? I'm sorry? Why was that? Did you pursue one? Well, we did pursue one initially. And here's the reason why. And this is how we pursued one. I was in communication with a Lake County prosecutor who was pursuing the DUI criminal charge. I've had numerous phone call conversations with him. I've had e-mail conversations as well. And I specifically asked him numerous times during your investigation, and to Mr. Kutzer, who was the Eiffel party, where was he that night? Was he at a restaurant? Was he at a bar? Was he at a friend's house? So you relied on what the assistant state's attorney told you. Yes, who has, at that time, better information than I would have, since we did not have a lawsuit on file at that point. He was cooperating with us, and we were cooperating with the state's attorney as well, in trying to determine, were there any other avenues of recovery? Well, the person who ran into the injured worker had to be drinking somewhere, correct? Whether it's at home or an establishment that would give rise to a dram shop claim. And you couldn't figure that out? No, we did figure that out. And what was the answer? The answer was he was drinking with friends. I mean, where? You never figured out where. We were told that he was drinking at home with his passenger that was in the vehicle with him. And here's the problem with the whole dram shop issue and what was considered by the lower court. When the successor counsel came into the fray in this matter, they claimed that they conducted some type of investigation into a potential dram shop. As someone that has defended dram shop cases and prosecuted them, I know very well there's only one-year statute of limitations. When the successor counsel came in, they performed an investigation for a potential dram shop claim. That's not possible at that time. So the question is, what were they pursuing at that point? Were they pursuing potential claims against my law firm for potential legal malpractice? What were they telling their client? And that's the problem that we have with the lower courts. But you also then obviously knew of the one-year statute of limitations yourself. Yes. Was that ever discussed with your client? It was. And that was part of the discussion that we had when we had conversations with the Lake County prosecutors, because in addition to those conversations, Mr. DeMoor himself even had to appear in court numerous times, which I facilitated to make him sign even HIPAA forms because the prosecutor wanted a copy of his medical records as well as part of the criminal prosecution. So your position is that your former client would not have cooperated with the prosecution without your assistance? No, not at all. I'm trying to see what benefit to your client was that effort. The benefit of it, Your Honor, was that we were investigating, trying to find out if there were other avenues of recovery. And in doing so, we had the assistance of the ASA at the time, who was pursuing a criminal prosecution. So in addition to our own hiring a private investigator, we also had a criminal prosecution ongoing as well. Okay. Word I read, or I thought I read somewhere in the record, that there was a discussion, a colloquy between you and your client, in which you told them the statute of limitations was two years. Do you recall the allegation? I do recall the allegation, and I vehemently deny that. And the reason why, just as I've mentioned to Your Honors, I started out doing insurance defense work when I got out of law school. I've handled defense of these cases for numerous years. And when I started on the plaintiff's side, I've prosecuted at least 10 DUI cases. Now it's saying that, did you, in fact, have a conversation with your client about the statute of limitations on the drama subject? Yes, we did. When was that? That was at the very beginning of my representation. Because I said to him, as we obtained information from State Farm, from the adjuster, who he contacted right away, we were told that there was only $100,000 in coverage. Given the nature and extent of his injuries at that time, I knew that it was my duty to make sure that we could seek all avenues of recovery, either it be an employer, either it be some type of dram shop, some type of agency, any other possible potential. So your position is, if you were entitled to the entire fee, then you would say that successor counsel really is entitled to nothing and did nothing? That is our position here. And if you take the factors, the seven factors that are laid out in the case law, and you look to see what successor counsel did after the fact, it essentially is affirmation as to all the work that we did, default. Now, their argument potentially is going to be, well, we explained to Mr. Gamora how the quote-unquote system works. Well, that is a conversation that could take 10 minutes. Did the trial court have a problem with what I thought was represented to him, that your office accrued around 450 hours' worth of work? Not necessarily that we ever got into that discussion, Your Honor. However, here's the problem with that, is that even if, let's say hypothetically here, I spent five hours on this and obtained the same result, the maximum policy offer that was offered from state law, and successor counsel comes in and does, let's say, 450 hours of work, how would they change the outcome in factor number seven, i.e., the benefit to the client? They haven't. They haven't increased anything. So, therefore, you would have to weigh the factors. We review the trial court's decision here ultimately under an abuse of discretion standard of review. Is that correct? Correct. And you know what that standard is? Yes. That means that in order to overturn the trial court's finding and decision in this case, we would have to find that no reasonable person would agree with the trial court's decision. That's a pretty high standard, isn't it? I agree absolutely. And we believe this is a case in which no reasonable person, in applying the applicable case law here of Wagner-Rhodes, the judge didn't follow those laws. And he considered red herrings that had no factor on this case. What are the red herrings? Some of the red herrings, Your Honor, is counsel initially, when we filed our response brief, we filed a 14-page response brief in which they did not file any type of reply. Some of the red herrings I would say that they argued in this case was this comment about referral fee agreements. There was no referral fee agreement in place. The attorney that referred this case to me, Jeannie Miller, picked up the phone and said, I have a potential client for you. Here's his name and his number. Do you want to meet with him? That was the extent of the conversation. I'm well aware, as they're actually our counsel in these chambers, who I have referral agreements with, and I understand under the rules of professional conduct that they have to be in writing and agreed to by the parties and the client. That in itself is a red herring because it has no bearing on this case whatsoever. So there was no referral fee involved? There was no referral. No. Okay. Another one, I think, Your Honor, you pointed out, was the 450 hours, that comment. The other issue that has come up that I wanted to point out is the ---- Wait a second. Is that the only red herring? The two was the, what I would say is the referral fee and also the affidavit. A couple other things here that are in the record was when I obtained notification that I was being discharged from Mr. Moore's case, I received a letter from Mr. Popovich's office in so many ways stating that they were considering a legal malpractice case against me, almost in a threatening manner. That, I think, is ungrounded, unfounded. And on top of this, when this matter went to hearing, there was a conversation with the attorneys that represented my law firm at the time that Mr. Popovich stated to us that it would be, quote, unquote, very dangerous if I appeared to testify at the hearing. Those bill threats, I don't take lightly. I'm sorry. Is that in the record? It is. Okay. I don't take those bill threats lightly, especially from colleagues. We both are plaintiffs' lawyers. We represent injured parties in these matters. Now, in addition to that, though, you could have submitted timesheets, right? We could have. And did you? We did not. I submitted an affidavit. The other thing I want to point out very quickly is the arguments by successor counsel in this case, they also make the claim that I do not have authority to negotiate a policy limits offer from State Farm on behalf of Mr. Newborn. The record is stock full of e-mails, correspondence of me speaking with Mr. Newborn. But here's the crux of it, is that on one hand they say I don't have the authority to negotiate some type of settlement offer, but I do have the authority to negotiate all of the medical needs in this case, which we did, before discharge. You can't have it one way or the other here. And when we talk about, as your Honor asked the question of what, if any, should successor counsel receive in this case, that goes to that fact as well. At no point did they do anything besides speak to Mr. Newborn. Yes, they're going to get up in front of you and say we took depositions, we determined if there was some type of dram shop or further agency type of claims, but there's no evidence of any potential claim. All they did was essentially repeat all of our investigation that we did and also got the policy limits. Well, you made that argument before the trial court, right? We did. And the trial court didn't agree with it? It did not. Okay. I assume your affidavit was admitted into evidence? It was. Was there any cross-examination of that affidavit? I don't believe so, Your Honor. And I believe you didn't attend the hearing, is that correct? I did not. I decided not to. You had a member of your office attend the hearing? I actually had a counsel for myself in our law firm that we hired. Okay. Did that counsel testify at all? No, she did not. Okay. Any other questions? No. Thank you, sir. You'll have an opportunity to make rebuttal. Thank you. May it please the Court, Counsel, Mr. DeMoro, good morning. Good morning. The term quantum error has been described. You're a Mr. Appelbeck? I'm sorry? You came for the record, okay. I'm sorry. Sean Kornack on behalf of the appellee. The term quantum error has been consistently defined in Illinois case laws, meaning, quote, as much as he deserves. The state of review, as Judge Hudson pointed out here, is abuse of discretion. The reason I point those out here at the outset of this is because it shows that the appellant in this case has an uphill battle to be successful on this appeal because what the appellant needs to do is convince this panel that for some reason, somehow, some way, Judge Foos abused his discretion when, after an evidentiary hearing, he issued an order providing compensation for Mr. Kauffman, specifically and precisely for the amount of work he did from the time he was hired to the time he was fired. Now, you are not appealing that your fees were insufficient, correct? No, sir. Not at all. And for me to do that, I'd have to make the argument that Judge Foos abused his discretion. As well. I don't believe that he did. Here. Did you object to the admission of the affidavit into evidence? Well, Judge, it was a plea. So we didn't – it was – the way that the case went was we filed our motion to adjudicate the lien under quantum error. Counsel filed a quantum error lawsuit and attached the affidavit to the quantum error lawsuit. There was an internal inconsistency as far as the hours were concerned, too, and I'll get to that in a moment. The road to success for Mr. Kauffman here gets rougher because, as you pointed out, he failed to appear at that hearing. Much of what he said here today is to horse the record. He's telling you things that he should have testified to when he came to court but didn't do that. The attorney who represented him presented no evidence, no testimony, no documentation. Importantly, no documentation to support Mr. Kauffman's absurd contention that he spent 450 hours working on the DeMori case from the time he was hired till the time he was fired. Judge Foos really spent a lot of time in his ruling on that. I just want to underscore what he has to say because it's important to the issue of use of discretion. Judge Foos, in one portion of his findings, said, I have no record showing how much time Mr. Kauffman put in on what tasks and, frankly, his affidavit where he says he spent 450 hours on Mr. DeMori's case, I frankly find that to be completely incredible. In another area, there's absolutely no support for that bold statement that he spent that much time. I find his affidavit to be completely lacking in credibility whatsoever, and this is the key. In another area, Judge Foos says, I have to say that I'm, frankly, offended by what I see as a completely false statement with respect to the number of hours he claims to put in on this case. So counsel provided the conclusion you've alluded to. He didn't provide any timesheets to support the 450 hours. Is that what you're saying? Well, that's partly what I'm saying. He didn't bring that evidence to bear, but also because of the testimony that I provided and the fact that Judge DeMori has years of experience in the defense of these types of cases, he confirmed that what I was telling him was true, that this is an absurd contention that he would spend that much time on this case doing the work that he claimed to have done. Not the work that he claimed to have done, the work that his file indicated that he did. Now, the reason I bring this up is because under Talent v. Alton Box Board Company and Lloris v. Dix, Judge Foos could have said, as much as you deserve in this case, Mr. Kaufman, is zero. Because in the Talley case, the appellate court, in affirming the circuit court, said the following, courts freely refer to the code of ethics as a reliable guide to what constitutes unprofessional conduct and that such conduct does have some effect on attorney's fees and, in some cases, may be a complete bar to any recovery. Judge Foos took into consideration the fact that by this absurd contention by Mr. Kaufman, he violated Illinois Rule of Professional Conduct 3.381, which cites in pertinent part the following, a lawyer shall not knowingly make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer. The reason I say that is Judge Foos had ample reason just with that issue alone to say, Mr. Kaufman, you deserve nothing, you violated the code of ethics. But he didn't. He provided him with compensation and he didn't have to. How is that, under any stretch of the imagination, an abuse of discretion? It's in the exercise of his discretion he decided not to do that and actually provide compensation for Mr. Kaufman. But that's not all. We get into these issues about his conversations with the client. Understand, the only reason we became involved in this case was because Mr. DeMoria came to me with a legal problem. In July of 2017, he was concerned because he thought he was getting pushed into settling this case that he had for $100,000. So he tells me, I had a conversation with Mr. Kaufman. I asked him, is there any other way that we can get compensation in this case? Can we pursue the drunk driver personally? Mr. Kaufman, as we pointed out in the hearing, said, no, Cuts here would just file for bankruptcy and you wouldn't get it back. That's wrong. That's a wrong interpretation of the law. Then, by the way, when the client confronted him after the statute of limitations ran on the dram shop, in my office, on the phone, in front of me, he asked Mr. Kaufman, what about this potential dram shop case? And to my surprise, Mr. Kaufman said, how did you even know he was drunk? Which is kind of an interesting question to have in this case. And also said, when specifically asked about what the statute of limitations was for a dram shop, said two years. I assume this is in the record, is it not? It absolutely is. And that's one of the things that Judge ran. Now, you heard this conversation? I did. He said two years? I'm sorry? He said two years. Yes, he did. Yes, sir. And it happened to be after the statute of limitations ran. Now, here's one thing I do want to stress because I heard Mr. Kaufman say this. He claimed that he did an investigation into the dram shop. And he spoke to the ASA from Lake County. Lake County didn't handle this case. It was a McHenry County case. And it was a local prosecutor named Drew Shaughnessy. However, if that was true and he actually spoke to this ASA prior to the statute of limitations and actually spoke to my client and told him that, there would have been, A, no reason for Mr. DeMoria to come see me. And, B, this is important. In January, January 4th, 2018, there was a court hearing in Lake County, a motion to dismiss half of Mr. Kaufman's filed lawsuit. Leading up to that, my client sent him a series of e-mails asking him about the dram shop. And what he said to him was, You keep ignoring me about this. In response, Mr. Kaufman sends an e-mail, it's in the record, saying, We haven't got the answers to discovery yet so I don't have enough information to provide you to discuss anything more about the dram shop. In other words, if he knew that the dram shop was one year rather than two years, he's still maintaining this ruse that it's a two-year statute of limitations up to January of 2018. Now, we told the client, Listen, what you should do is stay with him, see if he can right the ship, see if he knows, he catches this and then fixes it for you. So for nine months, we monitored this. And Mr. Kaufman did next to nothing in that nine-month period of time. The only reason the lawsuit was filed was because we told the client to tell him to file it. So I won't touch on this at any event. Illinois Rule of Professional Conduct 1.4 states that a lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation. He didn't do that in this case. Otherwise, I wouldn't have been involved. Judge Foos knew that. Judge Foos heard these arguments and still provided compensation for Mr. Kaufman. One minor thing. Mr. Kaufman still today is maintaining that he is entitled to a full third attorney's fees in violation of the Health Care Services Lien Act and the Attorney's Lien. Both statutes cap attorney's fees at 30% when the total amount of the liens meets or exceeds 40% of the sum paid to the injured person. Mandatory. It's not discretionary. Under Peterson v. Houtt, which I cited in my case, I'm sorry, Peterson v. Houtt v. Main Street, 2012, Bill Act I, 112, 9th, 7th, 1. In paragraph 24, the appellate court said the following. An attorney's lien is a creature of statute, and as such, the act must be strictly construed both as to establishing the lien, and here's the important part, and to the right of action for its enforcement. They go on to say attorneys who do not strictly comply with the Attorney's Lien Act have no lien rights. So Judge Foos could have adopted that finding in Peterson v. Houtt v. Main Street and again said, Mr. Kaufman, you have no lien. You get no money. But he didn't. He exercised his discretion and provided a compensation. So can it be said in this case that no reasonable person would take the view adopted by Judge Foos here? I don't know how anyone could. Simply put, Judge Foos did not abuse his discretion. I want to touch on De La Paz v. Wagner. I think Rogers v. Wagner is what Mr. Kaufman is relying on here. His argument is that Judge Foos abused his discretion by not following strictly the dictates of De La Paz v. Wagner, but that holding is by its own terms discretionary and not mandatory. The holding says, quote, if an attorney performed much of the work before discharge and a settlement immediately follows the discharge, the factors used to determine a reasonable fee, and here's the key language, would justify a finding that the entire contract fees the reasonable value of the services rendered. By its very terms, it is discretionary. It goes back to did Judge Foos abuse his discretion by not applying the facts in this case? Well, here's the two key components of the De La Paz v. Wagner case. Did he do much work? Was the settlement done immediately after the original attorney was fired? Neither of those factors are present here. Let's focus on the much work issue. Did Mr. Kaufman do much work before the discharge in this case? And Judge Ferguson pointed out, I think appropriately, that in this case State Farm had an issue where my client was stopped at a stoplight on his motorcycle, and he was struck from behind by a drunk driver. They have a $100,000 policy, and the damages in this case, just the medical bills alone, exceeded the policy by $40,000. I've been doing this type of work since 1994. I've worked with State Farm, if not on a daily basis, on a weekly basis throughout that period of time. I may disagree with them from time to time, but what you'll never hear me say is that they're stupid. They're not. They're not going to buy a bad-faith claim. They wanted to settle this case. They wanted to settle it as soon as possible. So what did he do to convince State Farm to do what they were already going to do? Literally nothing. According to the record that we had, the files that we had, and what I testified to at the hearing, he collected the medical records, collected the police report, he collected the medical bills, bundled them up, sent them to the insurance company, and demanded the policy. Our job as lawyers is greater than that. We have a fiduciary duty to our clients to treat their interest equal to or greater than our own. We're not there as mere conduits between the insurance company and the client. The duty of Mr. Kaufman in this case would be to do what we did, sit the client down, tell him what the alternatives are, let him know whether or not there's other avenues of compensation, and actively investigate them. Rule them in, rule them out. That's what we did. That's what he failed to do. That's why Judge Foos in this case found that Mr. Kaufman was entitled to what he was entitled to. We chose to just send our bills in and give the rest of the money to the client. The judge issued that order, and that's where we are today. Bottom line, Judge Foos did not abuse his discretion. Not in any way, shape, or form. He just did. That's all I have. Any other questions? No, sir. Thank you. Thank you. Mr. Kaufman, you may proceed. Well, this is the first time, Your Honor, that I have actually heard my opponent actually respond to any type of Wagner or Rhodes comments. Can I ask you a special question? You touched on something. Sure. He's alleging that the statutes, particularly the Medical Reimbursement Act, caps your claim at 30% irrespective of anything else. Absolutely. Is that true or not true? That is true. We do that in several cases, and we handle one on a weekly basis. But did you nevertheless seek 33% in front of the trial court? We did. Well, how do you explain the inconsistency?  When we negotiated these medical liens, we actually sent to Mr. DeMoor comments and also copies of the agreements pursuant to the Health Care Lien Act, which all of the providers would sign. That was explained to Mr. DeMoor that our attorney fees would not be the full one-third, that we would have to cap them at 30% plus our costs as well. So what happened when you got to court? Well, what happened when we got to court here is we have a situation in which we have successor counsel coming in and just as by his admission here today, he talks about having a conversation and explaining to Mr. DeMoor how the law works and how statutes work. But at the same time, Judge Fuse says, well, we're just going to split the paper because counsel, successor counsel, you did a great job and you explained to Mr. DeMoor what Mr. Kauffman already did in this case. That's not the law. And that's the problem that we have here. How does that explain you seeking a fee that you acknowledge was not hidden in the software? I'm seeking my contract. And let's just kind of back up a second. The hearing that took place was as to the motion that was filed. The quantum error lawsuit that we filed was never responded to. That was consolidated. And then during this evidentiary hearing, they want to call it, the only thing that was supposed to be discussed was the Dram Shop issue. And during this hearing, all of this other information came out as to their allegations of ethical violations of different items that Judge Fuse either was relying on for some reason or was just persuaded. None of those are bearing on the quantum error. Nevertheless, you pled one-third. I mean, you pled the 33%, correct? Yes. And are you telling us that at the time you pled that you knew you couldn't get more than 30%? No. When I filed my quantum error lawsuit, we filed it just with my affidavit to make sure, under the law, we were following Wagner and Rhodes. And you sought 33%? Correct. Yes. But how does that square with his argument that you couldn't have gotten more than 30 under the law? We're not squaring with that, Judge. Again, this is what we're talking about. This is another red herring in this case. They are bringing up items that have no bearing on Judge Fuse's decision in this case. And this is what has been going on, on and on and on. And the discussion about what we failed to do in order to get a policy offer, let's just make sure we're clear for the record. State Farm initially didn't offer the policy permits. They offered $42,000 seven months into the case. It was our efforts alone that was able to get from the $42,000 to the policy money offer eventually. Did they delineate any reasons for offering only $42,000? At the time, Mr. DeMoore didn't have his surgery. He was going through physical therapy. He was seeing a primary care doctor. I'm sorry, is that in the record? Yes, it is. And after he went to surgery, after I spoke with his surgeon from Suburban Orthopedics several times in person at his office to determine the nature and extent of his injuries, we communicated that to the adjuster as well. Counsel, you asked that, well, I'll read it. Mr. Kaufman also requests, in light of successor counsel's bad acts, the law offices of Thomas Popovich be required to pay Kaufman the fees and costs associated with bringing this appeal. You don't cite to any particular authority for why you should be allowed to collect fees. There is a case the Supreme Court issued, I believe in 2018, called People, X-Ray, Shade or Shod versus My Pillow, Incorporated. And the law offices of Steven Diamond brought a PTAM or QITAM proceeding and was entitled to a certain percentage damages and a statute provided for attorney's fees. The trial court did not grant attorney's fees, and the Supreme Court took the case after Justice Ellis in the First District wrote a decision that was quite eloquent and determined that the law is, since maybe 1858 or thereabouts, lawyers who represent themselves are not entitled to attorney's fees, nor are pro se parties entitled to attorney's fees. You actually have to incur them. So unless you have retained outside counsel, will you please explain why your request asking for fees should be allowed? We did retain outside counsel. Kelly Lindstrom is the attorney that we retained for the evidentiary hearing. Not the appeal? No. Okay. Any other questions? No, sir. Okay. Thank you. Your time is up. We'll take the case under advisement. We have other cases on calendar.